IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

JERRY TERRELL JACKSON,           )
                                 )
          Petitioner,            )
                                 )
     v.                          )     No. 1:06cv1097 (LMB)
                                 )
LORETTA K. KELLY,                )
Warden of the Sussex I           )
State Prison,                    )
                                 )
          Respondent.            )

MEMORANDUM OPINION

Jerry Terrell Jackson has petitioned for a writ of habeas corpus, challenging the constitutionality of the death sentence imposed by the Circuit Court of the City of Williamsburg and James City County, Virginia. In his petition, Jackson has alleged 17 constitutional errors in the guilt and penalty stages of his trial. The petition was denied in all respects as to alleged errors in the jury selection and guilt phases of the trial. See Jackson v. Kelly, No. 1:06cv1097, Dkt. No. 107 (E.D. Va. Aug. 14, 2008) (unpublished).

Remaining before the Court are Jackson's claims of constitutional error during the penalty phase. These nine claims are grouped together for purposes of this opinion, with Claims I, II and III dealing with counsel's failure to investigate and present mitigating evidence; Claims IV, V, VII and VIII attacking inadequate mitigation instructions; and Claims IX and X addressing inappropriate closing argument by the Commonwealth.

For the reasons explained below, relief will be granted as to Claims I, II, III, IV, V, VII and VIII, and denied as to Claims IX and X.

<u>Background</u>

On August 26, 2001, 88-year-old Ruth Phillips was found raped and murdered in the bedroom of her Williamsburg, Virginia apartment. Jackson, then twenty years old, was arrested shortly thereafter, and tried by a jury on two counts of capital murder along with charges of statutory burglary, robbery, rape, and petit larceny.[1] He was found guilty of all counts.

During the penalty phase of the trial, the Commonwealth called four witnesses and introduced evidence of Jackson's criminal record. J.A. 2622-49, 2663.[2] The defense called nine record custodians, seven witnesses who knew Jackson (including family members), and Jackson himself. <u>Id</u>. at 2664-2853. The jury found a probability that Jackson would be a "continuing threat to society," and recommended a sentence of death. <u>Id</u>. at

_____

[1] The details of the murder and police investigation are recounted in the Court's earlier opinion. That opinion also discusses, and rejects, the respondent's claim that Jackson's petition was untimely. <u>See</u> Memorandum Opinion, <u>Jackson v. Kelly</u>, No. 1:06cv1097 (E.D. Va. Aug. 14, 2008).

[2] "J.A." refers to the Joint Appendix filed in connection with Jackson's direct appeal to the Virginia Supreme Court. <u>See</u> <u>Jackson v. Commonwealth ("Jackson I")</u>, 590 S.E.2d 520 (Va. 2004). Neither party objected to its admission in this proceeding. That record also includes the transcript of the trial proceedings which will, therefore, be indicated as J.A. Excerpts from the evidentiary hearing held by this Court will be indicated as "Tr."

-2-

884, 887, 2884-87. The trial judge accepted that recommendation and imposed the sentence on April 3, 2003.[3] Id. at 2967. The Virginia Supreme Court affirmed the convictions and sentence on January 16, 2004. See Jackson I, 590 S.E.2d 520. The United States Supreme Court denied certiorari on October 4, 2004. See Jackson v. Virginia, 543 U.S. 891 (2004).

On December 3, 2004, Jackson timely filed a state habeas petition with the Virginia Supreme Court challenging his conviction and sentence. Without an evidentiary hearing, the court dismissed the petition on its merits on March 24, 2006. See Jackson v. Warden of Sussex I State Prison ("Jackson II"), 627 S.E.2d 776 (Va. 2006). On April 17, 2007, Jackson timely filed his federal habeas petition. The Court granted Jackson's request for an evidentiary hearing as to Claims I and III, and a two-day hearing was held.[4]

## Discussion

I. Standard to be Used Reviewing the Claims

---

[3] A Virginia trial judge may not impose a death sentence without the unanimous recommendation of the jury. Va. Code § 19.2-264.4(A) ("In case of trial by jury, where a sentence of death is not recommended, the defendant shall be sentenced to imprisonment for life."); Va. Code 192.-264.4(E) ("In the event the jury cannot agree as to the penalty, the court shall dismiss the jury, and impose a sentence of imprisonment for life.").

[4] To accommodate the witness's scheduling difficulties, Constance Howard testified via a video conference with counsel of record for both parties. Her testimony has been made a part of the record for this proceeding.

-3-

The applicable standard of review for a federal habeas
corpus petition is set out in 28 U.S.C. § 2254, as modified by
the Antiterrorism and Effective Death Penalty Act of 1996, Pub.
L. No. 104-132, 110 Stat. 1214, 1218-19 (1996) ("AEDPA").
Federal habeas relief is available only if the state court
adjudication was "contrary to, or involved an unreasonable
application of, clearly established Federal law, as determined by
the Supreme Court" or was "based on an unreasonable determination
of the facts in light of the evidence presented in the State
court proceeding." 28 U.S.C. § 2254(d)(1)-(2). A decision is
"contrary to" clearly established federal law if it either
applies a legal rule that contradicts prior Supreme Court
holdings or reaches a conclusion different from that of the
Supreme Court "on a set of materially indistinguishable facts."
T. Williams v. Taylor, 529 U.S. 362, 412-13 (2000). A decision
is an "unreasonable application" of clearly established federal
law if it "unreasonably applies" a Supreme Court precedent to the
facts of the petitioner's claim. Id. at 413. Certain state
court findings of facts are presumed correct unless the
petitioner rebuts that presumption by clear and convincing
evidence. 28 U.S.C. § 2254(e)(1).[5]

---

[5] The Commonwealth submitted a Notice of New Authority
following the Supreme Court's decision in Wood v. Allen, 558
U.S.___, 08-9156, slip op. (Jan. 20, 2010), in which that Court
assumed, without deciding, that the § 2254(e)(1) standard for
reviewing a state court's findings of fact applies only to claims

-4-

Jackson's claims fall into two categories: stand-alone claims of constitutional error and claims of ineffective assistance of counsel related to those errors. All of the stand-alone claims are procedurally defaulted, as they were either not raised at trial or not raised on direct appeal. The merits of a procedurally defaulted claim cannot be considered unless the Court finds "cause." The only ground for "cause" alleged by Jackson is ineffective assistance of counsel. See Coleman v. Thompson, 501 U.S. 722, 754 (1991) ("Where a petitioner defaults a claim as a result of the denial of the right to effective assistance of counsel, the State, which is responsible for the denial as a constitutional matter, must bear the cost of any resulting default and the harm to state interests that federal habeas review entails."). Therefore, all of Jackson's remaining claims will be analyzed as ineffective assistance of counsel claims.

To establish ineffective assistance of counsel, Jackson must satisfy the two-pronged test established in Strickland v. Washington, 466 U.S. 668 (1984). First, he must demonstrate that his trial counsel's performance "fell below an objective standard of reasonableness." Id. at 688. Next, he must "show that there is a reasonable probability that, but for counsel's

_____

for which the district court holds an evidentiary hearing, while § 2254(d)(2)'s slightly less deferential standard applies to the remainder of claims.

unprofessional errors, the result of the proceeding would have been different." Id. at 694.  Because a death sentence cannot be imposed in Virginia without the unanimous recommendation of a jury, to satisfy the prejudice prong Jackson need only show that "at least one juror would have struck a different balance" in the sentencing determination.  Wiggins v. Smith, 539 U.S. 510, 537 (2003).  See also Buckner v. Polk, 453 F.3d 195, 203 (4th Cir. 2006) (petitioner must demonstrate "[a] reasonable probability that, despite [his] legal eligibility for the death penalty, one juror considering the original and newly raised evidence together would have voted for life imprisonment.").  Cf. Va. Code § 19.2-264.4(E)("In the event the jury cannot agree as to the penalty, the court shall dismiss the jury, and impose a sentence of imprisonment for life.").

II.  Claims I, II and III: Counsel's Failure to Investigate and Present Mitigation

In Claim I, Jackson alleges that counsel failed to investigate fully and present effectively to the jury the extent and scope of devastating physical and psychological abuse he suffered at the hands of his biological father and stepfather. Undiscovered evidence included testimony of Jackson's brother Damien Jackson and half-sister Chandal Jackson, both of whom witnessed the abuse and would have testified about it.  In Claim II, Jackson alleges that counsel failed to investigate and present any evidence explaining how childhood abuse affects adult

behavior and lessens moral culpability, and in Claim III he alleges that trial counsel totally failed to present any evidence of his positive qualities.

Although all three of these issues were before the Virginia Supreme Court when it reviewed Jackson's state habeas petition, that court only ruled on Claims I and III. As to Claim I, the Virginia Supreme Court decided, without holding an evidentiary hearing, that the testimony of Jackson's siblings would have been merely cumulative of the evidence presented at Jackson's trial. Jackson II, 627 S.E.2d at 786. As to Claim III, the court held that trial counsel had presented evidence of Jackson's positive qualities, and that his failure to present additional such evidence was neither deficient performance nor did it prejudice Jackson. Id. at 445-47.

This Court found that an evidentiary hearing on these claims was necessary for a full and fair review, and that such a hearing was appropriate under 28 U.S.C. § 2254(e)(2) (barring evidentiary hearing only when "applicant has failed to develop the factual basis of a claim in State court") and M. Williams v. Taylor, 529 U.S. 420, 437 (2000) (explaining that a petitioner has not "failed" to develop facts if he sought an evidentiary hearing in state court). There was no absence of diligence here, as Jackson requested, but did not receive, an evidentiary hearing in state court. Moreover, whether to conduct an evidentiary hearing in a

capital habeas proceeding is committed to the sound discretion of the district court. See Conway v. Polk, 453 F.3d 567, 582 (4th Cir. 2006). Having had the benefit of a two-day evidentiary hearing, the Court finds that even under the extremely deferential standards for collateral review of a state court judgment, the conclusions of the Virginia Supreme Court were an unreasonable application of clearly established federal law.

A.   Deficient Performance

1. Claim I: Failure to Interview Jackson's Siblings.

Jackson's claim that his trial counsel[6] were constitutionally ineffective focuses primarily on their failure to interview his older brother, Damien, and his half-sister, Chandal, about the abuse Jackson suffered as a child.  Damien lived in the same household with Jackson during his childhood. Chandal lived with her maternal grandmother before moving into Jackson's household when Jackson was about eight years old; however, even before moving in, she frequently visited with her half-brother and often spent weekends with him.  Tr. 13-14. Jackson maintains that they both witnessed and experienced the

---

[6] Jackson was represented at trial by Patrick Kelley, Esq., and Andrew A. Protogyrou, Esq.  Kelley was primarily responsible for the investigation and presentation of the guilt phase, whereas Protogyrou took primary responsibility for the investigation and presentation of the penalty phase.  Tr. 222-23, 318.  Because this opinion discusses Jackson's claims with respect to the penalty phase, all references are to Protogyrou unless otherwise indicated.

physical and psychological abuse inflicted by Jackson's biological father, Jerry Levi Hamilton, and his stepfather, Tim Knight, and could have provided compelling testimony about Jackson's childhood that the trial witnesses were unable to present.

The Virginia Supreme Court expressly declined to address whether these alleged omissions constituted "deficient performance," because it found that even if Jackson's allegations were true, his siblings' testimony would have been cumulative and therefore he did not suffer prejudice. See Jackson II, 627 S.E.2d at 786. Accordingly, because the Virginia Supreme Court did not reach the deficiency prong of the Strickland analysis, this Court's review of that issue is de novo. See Porter v. McCollum, 558 U.S. ___, 08-10537, slip op. at 9 (Nov. 30, 2009); Rompilla v. Beard, 545 U.S. 374, 390 (2005).

i. Factual Findings

There is no significant dispute over the factual basis for the deficient performance claim,[7] and the Virginia Supreme Court failed to rule on that prong of Strickland or to make any factual findings in that regard. Jackson has clearly established that

_____

[7] In its post-evidentiary hearing brief, the Commonwealth does not contest the factual issue of whether counsel conducted investigative interviews of Damien or Chandal, but instead argues that any failure to interview the siblings was part of trial counsel's strategy. Nonetheless, the factual basis for the claim is outlined here because some of trial counsel's testimony suggested that he did speak to them, albeit briefly.

counsel never interviewed either Chandal or Damien to determine what they knew about the abuse Jackson had suffered or any of his good qualities. Both Chandal and Damien categorically testified that they were not interviewed by Jackson's trial counsel. See Tr. 59, 62, 147-49. Trial counsel testified that he spoke with Damien once via telephone, but solely to ask him whether he planned to attend the trial. Id. at 397-98. Counsel also testified that he met Chandal at an early meeting with Jackson's mother and his stepfather, but that she was "in and out" of the room during that meeting. Id. at 383-84. He did not remember ever meeting with Chandal alone, and could not recall, nor does the record identify, any occasion where she was actually interviewed. Id. at 383, 390-91.

Even accepting counsel's testimony that he spoke briefly with Damien and Chandal at some point, this record clearly establishes that counsel never conducted a substantive, investigative interview with either sibling, and counsel conceded that he did not discuss specific incidents of abuse with them. Id. at 412.[8] Moreover, counsel admitted that the main purpose of his single phone conversation with Damien was to ensure that Damien would not attend the trial, see id. at 399 ("I did not

---

[8] At some point trial counsel may have intended to interview both siblings because Damien and Chandal's names are listed on a document, titled "AAP/Criminal/Jackson, Jerry/ Family add's," in trial counsel's files. See Pet. Exhibit 52. However, the file contains no other reference to Damien or Chandal.

want him there. . . . That was my trial strategy."), and there is no evidence that he asked Chandal any questions regarding Jackson's abusive upbringing when he allegedly met her.

ii. Analysis

When evaluating the adequacy of a trial counsel's preparations under the deficient performance prong of Strickland, "[c]ounsel's conduct is generally presumed to be a reasonable strategic choice, but is not reasonable to the extent that the choice of strategy does not rely upon either a full investigation of the law and facts or an abbreviated investigation of the law and facts limited only by reasonable professional judgments." Buckner, 453 F.3d at 201(internal quotation and citation omitted).

The scope of trial counsel's investigation must be viewed "under prevailing professional norms" and in light of the facts "as seen from counsel's perspective at the time." See Wiggins, 539 U.S. at 523 (internal quotation and citation omitted). In capital cases, the Supreme Court has stated that trial counsel's mitigation strategy "should comprise efforts to discover all reasonably available mitigating evidence." Id. at 525 (emphasis in original) (quoting American Bar Association Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases ("ABA Guidelines") (1989 ed.) 11.4.1(C)). This obligation includes interviewing "witnesses familiar with aspects of the

client's life history" that might uncover "possible mitigating reasons for the offense(s)." Id. at Guideline 11.4.1(D)(3)(B).; see also ABA Guidelines (2003 ed.) 10.7, cmt. ("It is necessary to locate and interview the client's family members (who may suffer from some of the same impairments as the client).").[9]

Trial counsel recognized his obligation to pursue all reasonably available evidence regarding Jackson's abusive upbringing and testified at the evidentiary hearing that such evidence was the focal point of his mitigation strategy. See Tr. 377 ("I wanted to put as many beatings into evidence as possible at the mitigation phase."). To implement that strategy, counsel assembled a collection of Jackson's medical, social, and educational records, which contained references to numerous instances of abuse by Jackson's biological father, Jerry Levi Hamilton, and stepfather, Tim Knight.[10]

---

[9] The ABA Guidelines, revised in February 2003, represent the reasonable practice of capital defense counsel at the time of Jackson's trial, which took place in October and November 2002. Jackson's death sentence was imposed by the trial judge in April, 2003. Although they are not dispositive as to the reasonableness of an attorney's conduct, they are "guides to determining what is reasonable." Wiggins, 539 U.S. at 524 (quoting Strickland, 466 U.S. at 688). See also Bobby v. Van Hook, 588 U.S. __, 09-144, slip op. at 5 (Nov. 9, 2009) (the guidelines are not "inexorable commands with which all capital defense counsel must fully comply," but are "evidence of what reasonably diligent attorneys would do[.]" (internal quotations omitted)).

[10] The records themselves were not admitted into evidence. However, they were incorporated into the state court record and were available for the Court's review.

However, assembling those records was not, in and of itself, an adequate mitigation investigation.  See Wiggins, 539 U.S. at 527 ("In assessing the reasonableness of an attorney's investigation, however, a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further.") (emphasis added).  The records themselves had little evidentiary value at trial.  As counsel recognized, see Tr. 409, the documents were not admissible.  Instead, third-party record custodians, with little or no personal knowledge of the incidents or of Jackson himself, simply read portions of the records to the jury.  The readings were so dry that the trial judge himself warned on the record that "I have got to tell you that some of the testimony, and you will agree, is a little tedious, a little slow, and it's not, I won't say boring, but it's difficult and it's low key. . . . it would be relatively easy for someone to doze off. . . . I am paying as close attention as I can and sometimes I get a little tired."  J.A. 2789.  Trial counsel actually acknowledged in his closing argument to the jury that the presentation of records "probably seemed somewhat confusing. . . . you were forced to hear psychologist after psychologist, records custodian [sic] throw things at you that almost came with no semblance of an order."  Id. at 2686-69.

Moreover, the records were incomplete, limited snapshots of Jackson's childhood, documenting only four or five instances of abuse and providing mental health assessments from a few isolated time periods. Each was generated by a third party who did not witness the abuse, but who instead relied on after-the-fact examinations and statements by the parties involved, including Jackson's abusers, who had every incentive not to be candid.

Most importantly, the disturbing evidence in the records would unquestionably "lead a reasonable attorney to investigate further." Wiggins, 539 U.S. at 527. Abuse was already occurring by the time Jackson was two years old. J.A. 587 ("[Redacted] and [redacted] visited the office. They said they continue to not know how [Jackson] broke his arm."). Reports exist for isolated incidents at ages seven, nine, twelve, and thirteen.[11]

Numerous entries within the records should have prompted further investigation by Jackson's attorneys. For example, a report generated after a particularly severe beating by Tim Knight, when Jackson was twelve years old, notes, "There is a previous history of abuse by [redacted] and this incident appears

---

[11] Several of these incidents were investigated by the Commonwealth. In September 1990, Child Protective Services determined that a physical abuse complaint against Tim Knight was "founded." J.A. 665. Knight was ordered to counseling. J.A. 674. On May 17, 1993, the James City County Department of Social Services successfully applied for a protective order, directing the family to counseling and prohibiting all physical discipline by Tim Knight. Id. at 529, 538-40.

to be much more severe.  In addition, neither of the victims reported the abuse; Jerry's injuries were discovered by accident and he was reluctant to cooperate with the investigation."  Id. at 539.  The "planned, calculated" nature of that incident also leads to the conclusion that more abuse was occurring: "Both boys indicated that [redacted] made them strip naked and exercise so that they would be too tired to run from him during their punishment; [redacted] then beat both of them with his belt while they were naked."  Id. at 625, 538.  Another report of the same incident states: "This is the 3rd incident of known physical abuse of Jerry by Mr. Knight and the 1st resulted in maiming charges," Id. at 625 (emphasis in original), and estimating "the likelihood of reoccurance [sic] [is] high.  The children did not report the abuse, & Jerry was afraid to cooperate w/ DSS.  They appeared to accept their parents' decision that they deserved the beatings."  Id.  Another report contains a passing reference to a beating with a two-by-four.  Id. at 617.[12]  A report made when Jackson was nine years old states, "Worker asked if similar incidents had occurred & he stated that about two weeks earlier

---

[12] This may or may not be a reference to an incident in 1990, when Jackson was nine years old, in which "Injury was potentially serious because of manner of infliction – board was used."  J.A. 678.  Also perhaps referencing the same incident, a report reflects Knight beat Jackson, both with his fists and with a wooden board, giving him a bloody nose and cut lip, demanding to know whether his mother was still having sex with his biological father.  Id. at 669-73.

he had gotten his [redacted]." _Id_. at 670.  A social worker later wrote of Jackson, then age thirteen, "I get the impression that Jerry has been physically beaten by all the adults in his life, starting with his natural father." _Id_. at 533.  Another record notes that Jackson's mother and stepfather "seem[ed] to be confused about how to handle Jerry, since the Court has mandated that Tim cannot use physical punishment."  _Id_. at 2727.

The records also contain indications of serious neglect at an early age, which should have been explored further.  _See_, _e.g._, _id_. at 652 (A police report from 1988, when Jackson was seven years old, states "neighbors called the police when they found 2 children huddled in the stairwell—not the first time. . . . [redacted] locked them out of the apt."); _id_. at 2729 (referring to Jackson's "weak parental subsystem"); _id_. at 2677-79 (referring to "lack of parental attention"); _id_. at 2769 (referring to Jackson feeling "loss and abandonment").

The records in counsel's possession also contained leads to other types of mitigation evidence.  One report, for instance, contains a reference to Jackson "drinking alcohol" at age twelve, _id_. at 619, another to an allegation of sexual abuse by a relative, _id_., and another to an unexplored allegation that Jackson, at age seven, had been "outright raped" by a visitor at his grandmother's house.  _Id_. at 2799-2800.  These pieces of information, together with Jackson's report to his attorney

(reflected in counsel's notes) that someone forced Jackson and his brother to masturbate in front of them, Tr. at 237("Made him + brother masturbate in front of him."), that he was "molested for years, id. at 236, and that his brother was raped by an uncle while Jackson hid in the closet fearing he would be raped next, id. at 357, indicate the likely existence of a wealth of mitigating evidence completely unexplored by trial counsel. Those records also document that Damien would have direct knowledge of the abuse because he was referenced in the reports as well.

The records also contain passing references to diagnosable depression, even at age thirteen, possibly stemming from a complicated and violent relationship with his natural father. J.A. 533 ("Psychological testing indicated that Jerry idealized his natural father and has much sadness around their estranged relationship.  Psychological testing reveals that Jerry meets the criteria for DSM III-R Major Depression[.]").  See also id. at 205 (describing Jackson's relationship with his biological father as "fraught with conflict and possible abuse");id. at 2729 (referencing "major depression").

Counsel did interview several people, including: Jackson's stepfather, Tim Knight; Jackson's mother, Amelia Knight; Jackson's biological father, Levi Hamilton; and a handful of other witnesses who never lived in the Jackson household.  The

only witnesses who ultimately testified about problems in
Jackson's background, however, could give extremely limited,
second or third-hand accounts.[13]

Faced with this evidence a reasonable attorney would have
realized that a thorough investigation into Jackson's home life
was essential, and that interviewing Jackson's parents and
stepfather, who were responsible either for the abuse or the
failure to correct it,[14] was insufficient.  For instance, the

_____

[13] For example, Jackson's godmother, Muriel Custalow,
testified that a neighbor told her Jackson and his brother were
often left tied in chairs during the day, J.A. 2757, that she
spent time bathing and clothing Jackson, Id. at 2756, and that
she discovered his broken arm when he was two years old.  Id. at
2757-58.  Tiffany Williams, Jackson's cousin, stated she twice
observed bruises on Jackson as a child.  Id. at 2765.  Steven
Jackson, Jackson's uncle who has since been implicated in sexual
abuse of Damien as a child, testified that he had never witnessed
any problems between Jackson and his parents.  Id. at 2809-10.
Lastly, Pastor Mike Privett, who knew the Jackson family for only
two years, reported the family's problems "were not that far from
what a lot of families go through."  Id. at 2813, 2815.

[14] Jackson's uncle, Steven Jackson, who was called as a
witness and denied knowing about the abuse, was implicated by
counsel in testimony before this Court as being a sexual abuser
of Jackson's brother Damien.  Tr. 361 ("The only sexual abuse
that I remember discussing with Mr. Kelley at any time would have
been what [sic], the issue dealing with the rape and the seeing
him watching his brother get raped. . . . The only player was the
uncle[.]").  Trial counsel described the uncle as one of the
"bigger players" in the abuse timeline.  Id. at 404 ("[B]y then,
I decided that I was going to go with bigger players, frankly. .
. . Bigger players: the mother, the father, the stepfather, the
uncle. . . . That he had been beaten was all coming in, so we
started looking for the actual players who did it, and that's why
we called them[.]").  See also id. at 441 ("The accusations were
such that his [the uncle's] relationship, he begged off of it.
He was not forthcoming[.]").

records contain references to Jackson's mother's endorsement of Knight's abuse.  See, e.g.,  J.A. 618 ("both she and her husband agreed that they [the boys] needed a whipping this time").  Counsel recognized that during her interviews, Amelia Knight was "attempting to always downplay" the abuse.  Tr. 411.  The records also reflect Tim Knight's negative opinions of Jackson and disinterest in helping him.  For example, when Jackson was fourteen and the family attended counseling sessions, Knight would "continually verbally attack[] [him] . . . stating that he hates him[.]"  J.A. 110.  See also id. at 205, 139, 135 (describing Jackson's relationship with his stepfather as "conflicted and strained," "very poor, and sometimes abusive," and "exremely turbulent").

Competent counsel would have expected, at the very least, that Jackson's father and stepfather would distance themselves from any allegations of abuse.  Jackson's father had not had any contact with him for two years before the trial, Id. at 2817, and had told trial counsel's investigator that "he did not have anything good to say" and that "you do not want me there" in court.  See Resp. Ex. F, at 2.  The stepfather had at various times called Jackson "evil," blamed him for the couple's marital problems, and repeatedly sought to kick him out of the house.  See, e.g., J.A. 110, 141.

Despite these witnesses' hostile attitudes towards Jackson,

defense counsel defended their decision to call the fathers to testify as an effort to highlight their abuse of Jackson by showing their indifference to him.  With respect to Jackson's father, counsel claimed that he wanted to show "the absolute no love that was between the two of them at the time . . . to show how cold he was, how he didn't care."  Tr. 423.  Regarding the stepfather, Protogyrou indicated that he sought to question him on "[t]he issue of the beatings that [Jackson] had suffered at his hands."  Id. at 425.  But counsel's actions at Jackson's trial completely undercut the credibility of their explanations.  As the trial record shows, counsel allowed both fathers to deny the extent of the abuse, and failed to challenge the stepfather when he justified the abuse as tough discipline for an unruly child.  Counsel did not probe either father, or Jackson's mother, about any beatings.  And, most tellingly, in his closing argument counsel failed to refer to the coldness and indifference of Jackson's father, or to stress the abusive background that he claims was one of the strategic reasons for calling these witnesses to testify.

Moreover, counsel recognized that they could not depend on Jackson alone to report the extent of abuse by his father and stepfather.  See id. at 357 ("[Jackson] was not a great historian at the time . . . I think he remembered getting hit, but I don't think he remembered the specifics.").  Given that the abuse

appears to have begun when Jackson was only two years old, reasonable counsel would have known better than to stop the background investigation with the limited witnesses they interviewed.

Under these circumstances, counsel's failure to interview Damien and Chandal was a critical and glaring omission. Both siblings were older than Jackson, lived with him in the same household for a significant period of time, and suffered some of the same abuse. The records and evidence that counsel did possess indicated specific areas for further investigation, to which Damien and Chandal were the only credible witnesses. At the very least, competent counsel would have wanted to investigate whether Damien or Chandal could have offered detail to the reported abuse, described the nature of Jackson's relationship with his father and stepfather, or indicated whether there were other unreported problems. Further, both siblings were available to counsel, and, as discussed _infra_ in the prejudice analysis, both siblings would have offered a wealth of evidence far beyond what was contained in the records and presented to the jury.

The Commonwealth makes two arguments to support its position that the failure to interview Damien and Chandal was not deficient performance. First, the Commonwealth claims that trial counsel's investigation was reasonable, because "Strickland does

not impose a constitutional requirement that counsel uncover every scrap of evidence that could conceivably help their client." Tucker v. Ozmint, 350 F.3d 433, 442 (4th Cir. 2003). This argument is unpersuasive. When a capital defendant's mitigation case is based on his abusive family life, interviewing the defendant's two siblings is not "uncover[ing] every scrap of evidence;" it is a basic step that any competent defense attorney would take.

The Commonwealth's main argument is that trial counsel's decision not to call the siblings as witnesses was an "unimpeachable" strategic choice. At the evidentiary hearing, trial counsel indicated that he did not want the jury drawing unfavorable comparisons between Jackson and his siblings. Tr. 398, 450 (regarding Damien, he explained, "I didn't want the jury to see someone in a Navy uniform who made it out of there fine versus what happened to my client"); id. at 425 ("That picture in front of the jury would have been, in my mind, he got out, she got out, they suffered the same, yet he chose a life of crime . . . ."):

Review of the trial transcript clearly shows, however, that counsel did not rely on this "strategy" at trial. In fact, on direct examination of Jackson's father, counsel asked, "Did you have any other children with her [Amelia] other than Jackson?" "How many more?" "And what was that child's name?" and "That

would be his brother?"  J.A. 1573.  This line of questioning,

with no apparent purpose, opened the door about Damien, who was

the only subject of the prosecution's cross examination.[15]  And

in questioning Jackson's mother defense counsel openly invited

the jury to compare Jackson to Damien:

> A.   I think [Jackson] felt like I wasn't showing them
>      enough attention as I was showing my husband.  They
>      wanted, you know, me to be more into them.
>
> Q.   You mean them, his brother also?
>
> A.   Yeah.
>
> Q.   <u>His brother [Damien], however, didn't have the
>      problems ultimately that Jerry had, did he?</u>
>
> A.   No.  He had some problems, but he corrected
>      himself.  Like he had started stealing.  He got – I
>      had been back and forth to court with him, and
>      tried to get him straight and he corrected himself.
>      He knew that it wasn't right to do that.

Id. at 2841 (emphasis added).  The prosecutor repeatedly used

this exchange to emphasize Damien's ability to correct his

behavior despite growing up in the same household as Jackson, and

even cross-examined Jackson about this testimony: "[W]hen your

mother just said that Damien corrected himself, you understand

that?"  Id. at 2851.  In closing argument, the prosecutor pointed

---

[15] The prosecutor asked Levi Hamilton only three questions:
"Mr. Hamilton, your other son, Damien, when Jerry Jackson was
living with you and Ms. Knight [Amelia], was Damien also living
with you?  Were the two young men living with you and Mrs. Knight
[Amelia] at the same time?"; "Then after you and Ms. Knight
parted ways, they both went with their mother, correct?"; "Your
son Damien is currently serving his country in the U.S. Navy?"
J.A. 2822.

-23-

out, "His brother Damien, who is now in the Navy, his mother said, he corrected himself." Id. at 2818. Worst of all, Jackson's trial counsel himself adopted that comparison in his closing argument, when he stated, "Sure, one brother came out all right. But do we kill the bad egg?" Id. at 2872. Thus, counsel's assertion that he made a strategic decision to avoid any comparisons between Jackson and his siblings is simply not credible.

More fundamentally, the Commonwealth's position ignores the total failure of trial counsel to interview Damien and Chandal. As a result, he could not, and did not, know what assistance Damien and Chandal might provide, what evidence they might offer, what types of witnesses they would be, or whether their testimony would help or hurt Jackson. An uninformed decision cannot, by definition, be a strategic decision. See Gray v. Branker, 529 F.3d 220, 231 (4th Cir. 2008) ("counsel were not in a position to make an informed strategic choice about what defense theory or theories to pursue because they had failed to undertake a reasonable investigation *before* making that choice") (internal brackets and quotations omitted) (emphasis in original). See also Mayes v. Gibson, 210 F.3d 1284, 1290 (10th Cir. 2000) ("Without inquiring into what the witnesses might say, counsel had no basis for deciding their testimony would be inconsistent with his defense theory.").

The flawed nature of the Commonwealth's argument is best illustrated, however, by counsel's speculative assumption that Damien "made it out of there fine." Tr. 450. Based on exceedingly limited knowledge of Damien's life, counsel knew only that Damien had joined the Navy and, at least in his adult years, did not pursue criminal activity. Id. at 450-52. Based on these barest of details, trial counsel conjured up an image of someone whose comparison to Jackson only could have hurt the defendant.

As the evidentiary hearing established, however, the differences between Damien's life and the one envisioned by counsel were stark. At the evidentiary hearing, Damien described the repercussions of his abusive childhood environment, chief among them being numerous suicide attempts beginning at age twelve, when he swallowed a bottle of pills in his uncle's apartment. Tr. 132-33.[16] He joined the Navy largely "to get away from the family" because of "too many bad memories." Id. at 132. After joining the Navy, his problems only continued. He "felt depression a lot," and "just felt really out of place." Id. at 134. Although he married and fathered a son, he later became estranged from his wife:

> We're still married. I don't call her my wife, but she's
> my wife. And, I mean, my son's mother, she would just

---

[16] He also described how, at age 17, he "ran a bathtub full of hot water . . . had a razor sitting by the tub," wrote his mother a note, but did not harm himself after his mother found him and intervened. Id. at 133.

question, like, "Something's wrong with you.  You're different.  Why are you so different?" . . . Obviously, we're not really together anymore.

Id. at 135.  Damien testified that at one point he sent an email to a few Navy friends, indicating "how I was feeling really low, that life sucked, I wish I wasn't here, I wish I didn't exist anymore, I just wish I was dead."  Id. at 135.  One of the recipients was alarmed enough after reading the contents to report the email to Navy authorities, who went to Damien's apartment and took him to the base medical center.  Id. at 135-36.  In the counseling sessions that followed, Damien confronted the "demons" from his abusive upbringing.  Id. at 136.  Lastly, what is entirely lost in the transcript was the tense manner in which Damien testified and the tears which this military man shed when discussing the childhood he and Jackson endured.  The testimony was riveting and wholly credible.

Had trial counsel interviewed Damien, he would have learned that Damien, like Jackson, left the poisonous household with significant and debilitating emotional problems from Hamilton's and Knight's abuse that continue to haunt him.  Instead, without investigation, trial counsel jumped to the conclusion that Damien's and Jackson's lives were polar opposites, and that as a result, it was not worthwhile even to interview Damien.  Under these circumstances, "counsel had no basis for deciding [that Damien's] testimony would be inconsistent with his defense

theory." <u>Mayes</u>, 210 F.3d at 1290.

Counsel's failure to interview Chandal was based on similarly flawed, uninformed assumptions. Chandal, who spent her early years living with her grandmother, testified at the evidentiary hearing about the problems she encountered after moving into the household with her mother and Tim Knight. Originally a straight-A student enrolled in advanced placement classes, she started doing poorly in school and was suspended for fighting. Tr. at 49. When she was 16 or 17, she moved out of her mother's home to escape her stepfather's abuse and soon after dropped out of school. <u>Id</u>. Had trial counsel conducted the most basic interview with Chandal, he would have learned these facts, as well as Chandal's vivid recollections of Knight's physical abuse. Only then could he have made an informed judgment as to whether her testimony would have helped or hurt Jackson.

In sum, counsel made an entirely uninformed decision that Damien and Chandal would not be helpful witnesses. Instead of interviewing the two siblings who alone could have meaningfully testified about Jackson's background, counsel presented second and third-hand record witnesses, and called witnesses who had an incentive to deny or minimize the abuse. A competent attorney would have interviewed Damien and Chandal immediately upon reading the records in counsel's possession. Counsel was constitutionally deficient for failing to have done so.

      2.   Claim II: Failure to Link Abuse to Adult Behavior

Counsel did not present any evidence about the effect of Jackson's abusive childhood on his adult behavior. Whether this failure amounted to deficient performance is difficult to determine because, by failing to discover and present the crucial evidence of Jackson's abusive childhood, counsel failed to establish the basis for introducing scientific evidence linking the effects of such a childhood abuse to adult behavior. However, given the previous finding that counsel's failure to investigate and present the testimony of Damien and Chandal qualifies as deficient performance under <u>Strickland</u>, counsel's additional failure to connect the dots between childhood abuse and adult behavior must be viewed as yet another instance of deficient performance under <u>Strickland</u>.

      3.   Claim III: Counsel's Failure to Present Positive Mitigating Evidence

Claim III alleges that Jackson's trial counsel were ineffective for failing to investigate and present any evidence of his positive traits. Evidence of positive traits is recognized as appropriate mitigation. <u>See</u>, <u>e.g.</u>, <u>Porter</u>, 558 U.S. __, 08-10537, slip op. at 14 (recognizing a record of military service as a positive mitigating factor that should have been presented by defense counsel).

In rejecting Jackson's claim that counsel failed to present

positive mitigating evidence, the Virginia Supreme Court
determined that trial counsel had in fact put such evidence
before the jury:

> The record, including the transcript of the sentencing
> phase, demonstrates that the jury heard evidence of
> petitioner's good qualities, including evidence that
> petitioner was well-mannered and cooperative, followed
> directions, was motivated and ambitious, and had positive
> relationships outside of his immediate family
> environment.  In addition, counsel elicited testimony
> that despite two particularized incidents, petitioner had
> adjusted positively to confinement.

Jackson II, 627 S.E.2d at 787.

The majority of the "evidence" to which the court referred
consisted of hearsay statements recited by a psychologist who had
never treated Jackson personally, but read from reports
describing Jackson's demeanor during a counseling session when he
was approximately twelve years old.  See J.A. 2677 ("Noted to be
well-mannered, cooperative . . . followed directions . . .
persistent . . . had a high level of interest and motivation.").
Similarly, the court's reference to evidence of Jackson's
positive adjustment to incarceration appears to relate to one or
two isolated statements: one by a Commonwealth witness,
Correctional Officer William Griffin, who stated that until a
particular incident, he never had any problems with Jackson, Id.
at 2652-53, and another by Jackson's mother who stated that since
Jackson's incarceration, they were "able to communicate better
and talk more."  Id. at 2843.

The Virginia Supreme Court's determination, on the basis of this scant record, that "the jury heard evidence of petitioner's good qualities," Jackson II, 627 S.E.2d at 787, is "an unreasonable determination of the facts in light of the evidence." 28 U.S.C. § 2254(d)(2). These bland, hearsay comments offered no real insight into Jackson's character or personality. As a factual matter, Jackson has conclusively established, by "clear and convincing evidence," 28 U.S.C. § 2254(e)(1), that no genuine evidence of his positive traits was ever presented to the jury, and that the Virginia Supreme Court's terse finding to the contrary was clearly erroneous and unreasonable. Cf. Wiggins, 539 U.S. at 528 ("This partial reliance on an erroneous factual finding further highlights the unreasonableness of the state court's decision.").

Trial counsel offered two somewhat conflicting explanations for why he did not offer positive evidence, claiming first that such character evidence was not available and then that it was inconsistent with the defense's mitigation theme. Neither explanation is credible.

Counsel first explained his strategy concerning character evidence in an affidavit to the Virginia Supreme Court, in which he stated: "I presented testimony about Mr. Jackson's good adjustment to prison . . . . There was no other evidence that showed Mr. Jackson's good qualities because he just did not have

any good qualities." Protogyrou Aff. ¶ 7. However, if counsel had interviewed either Chandal or Damien he would have discovered evidence of a positive sibling relationship with their younger brother. Chandal described to this Court how, despite being the youngest sibling, Jackson was very protective of her and Damien and would sometimes get into fights with other children who were picking on them. See Tr. 56. She also testified about how much Jackson loved his maternal grandmother, once walking 10 miles to visit her in the hospital, and how Jackson was good to her young son. Id. at 53-55. In addition, she offered this hearfelt description:

> I just want to say that my brother is not this horrible person that you're trying to portray him to be. He was never given a chance. He's been abused his whole life. He's not, he's not a monster. He's not evil; he's just misunderstood. And, Terrell [Jackson], I love you (crying).

Tr. 54.

During the evidentiary hearing, Damien vividly described instances when Jackson tried to intervene to help his mother when she was being beaten. Id. at 129 ("Terrell [Jackson] would always just, just get him[self] really upset and cry and kept hitting Tim [their stepfather], telling Tim, 'Get off my mom, get off my mom,' and he [Tim] wouldn't get off of her."); see also id. at 111-13. Damien also testified that Jackson would come to his defense when he was teased in high school, often about sexual orientation issues. Id. at 137.

Other available witnesses, such as Reverend Joshua Slack, Constance Howard, and Willnette Banks,[17] could have offered specific examples of Jackson's positive behavior, beginning in the early 1990s, at the Oak Grove Baptist Church including assisting in church events, such as reading verses to parishioners during Bible Study.  Banks and Howard, as well as Chandal, could have described  how Jackson wanted to lead the congregation in singing his grandmother's favorite hymn during her funeral, but broke down in the middle of it.  See id. at 57, 216; Howard Dep. 14-15.

Counsel even failed to uncover positive character evidence from the witnesses he did locate.  Marie Simmons, Jackson's then-girlfriend, was summoned to the trial as a character witness but not called.  See Pet. Exhibit 62.  Counsel failed to explore with her, or with Jackson's cousin Tiffany Williams, who testified briefly on another issue, J.A. 2765, the subject of Jackson's character or good qualities.[18]  See Resp. Exhibits E, at 5-6, and

---

[17] Jackson had a very close relationship with his grandmother, Bernice Jackson, which was reflected during his interrogation by James City County investigators in December 2001.  See J.A. 3059-60.  Both Howard and Banks were long-time friends with Bernice, and had extensive personal interaction with Jackson through the church.  See Tr. at 213-14; Howard Dep., at 11-12.

[18] Both Williams and Simmons submitted sworn affidavits to the Virginia Supreme Court, proffering information that they would have given about Jackson's good qualities if questioned. However, because neither individual testified at the evidentiary hearing, the Court cannot assess their value as witnesses.

F at 7.

At the evidentiary hearing, trial counsel defended the decision not to present positive character evidence as a strategic or thematic choice.

> The issues thematically that were focused on in this case was the fact of the issue of abuse and how a young man comes out of the household he came out of committing other crimes, using marijuana and drinking, and thematically trying to explain why he ends up like that.
>
> The second issue that you've mentioned [Jackson's good qualities and characteristics] thematically at trial was not the issue that was the focus of the case. The theme of the case was how did this young man end up like this.
>
> The issue of his compassion was not an issue that was raised by witnesses when we talked to them to say he was a loving child, a great child, I think he liked -- if I remember correctly, there was a statement that he loved his grandmother. The trouble was he killed a grandmother, so thematically, that flies in the face of the mitigation portion of the case.

Tr. 321.

Such a thematic decision, _if_ made after a thorough investigation of all potential mitigating evidence, is the type of decision that will be upheld under Strickland.[19]  However,

---

[19] See, e.g., Cagle v. Branker, 520 F.3d 320, 327-28 (4th Cir. 2008), in which the attorneys conducted an extensive investigation into the defendant's background with the help of a mitigation expert and then elected to focus their presentation on the defendant's cognitive and emotional problems.  Although several family members were willing to testify about the defendant's loving relationships and volunteer work, counsel and their expert worried that such testimony could be effectively rebutted.  That strategic decision did not amount to ineffective assistance of counsel.

because counsel did not interview Damien and Chandal, they lacked an accurate picture of Jackson's relationship with his two siblings.  Accordingly, counsel could not have made an informed, strategic decision concerning the potential costs and benefits of testimony concerning Jackson's positive qualities.[20]  See Cagle, 520 F.3d at 328 (distinguishing counsel's strategic decision in Cagle from cases where counsel was found ineffective for choosing a mitigation strategy without adequate investigation).

Moreover, at the evidentiary hearing, counsel failed to articulate a credible reason why such evidence would have been thematically inconsistent with the abuse narrative.  In fact, the testimony from Damien, Chandal, and others regarding Jackson's positive qualities as a young child was wholly consistent with that theme, as it indicated how Jackson's behavior and life steadily deteriorated under withering and unyielding abuse.  On the record, counsel's failure to investigate and present positive character mitigation evidence cannot be justified as a strategic decision.

B.  Prejudice

1. Standard

In a capital case, a petitioner establishes prejudice from a failure to investigate and present evidence by showing "[a]

---

[20] Moreover, counsel apparently did not inquire into Jackson's positive qualities with the individuals whom they did contact, such as Williams and Simmons.

reasonable probability that, despite [his] legal eligibility for the death penalty, one juror considering the original and newly raised evidence together would have voted for life imprisonment." Buckner, 453 F.3d at 203; see also Wiggins, 539 U.S. at 537. In conducting this inquiry, a habeas court must look to the "totality of the evidence before the judge or jury" and ask whether trial counsel's deficiencies "alter[ed] the entire evidentiary picture" for the jury. Strickland, 466 U.S. at 695-96. This inquiry requires the Court to "reweigh the evidence in aggravation against the totality of available mitigating evidence." Wiggins, 539 U.S. at 534. If "the new evidence paints a picture . . . already presented to the jury," or if it differs from the trial evidence "primarily in degree" rather than "in kind," there is no prejudice. Buckner, 453 F.3d at 207, 204.

2. Evidence Presented at Trial

Because the prejudice inquiry requires reweighing the evidence, the evidence that was presented at the penalty phase of Jackson's trial is summarized here. The prosecution's penalty-phase presentation was fairly brief, consisting of Jackson's criminal history, J.A. 2663, which, although extensive, consisted mostly of property crimes and contempt violations, and did not contain any prior convictions for crimes of violence. Id. at 2857-58. The Commonwealth also called Richard Phillips, the victim's son, who described the effect the crime had on his

family.  Id. at 2622-2626.  In addition, two prison officers testified about two incidents of misconduct by Jackson while in prison, one when Jackson refused to comply with instructions, and another when he fought with another inmate.  Id. at 2630-34, 2647-49.  Finally, the Commonwealth presented testimony by Misty Kivette, who was a victim of a burglary Jackson committed the evening before Phillips was murdered.  Id. at 2653-61.

The defense called nine witnesses who either read from or summarized various medical and social services records from Jackson's childhood.  The records themselves were not admitted into evidence.  William Cummings, a medical doctor who did not have any personal memory of the events, read that when Jackson was eleven years old, he was brought to the emergency room with bruises on his back and arms.  Id. at 2667.  An unidentified family member reported that Jackson had been disciplined with a belt for stealing money.  Id.  Again referencing his report, Dr. Cummings recited his conclusion, "[N]o evidence of significant injury but possibly degree of punishment could be considered excessive."  Id. at 2669.  He could not identify the perpetrator of the bruises, as the name was redacted in the report.

Thomas Pasquale, a psychologist, testified from a report regarding a 1993 examination of Jackson conducted by a colleague, Margaret Gadeck, a psychological technician.  That report described Jackson, then in fifth grade, as cooperative and well-

mannered during the examination, with proper motor control and average intelligence, but suffering from mild depression caused by "lack of parental attention as well as the residuals of the attention deficit that he was experiencing." Id. at 2677-79. It also stated that Jackson was experiencing "adjustment disorder with depressed mood and attention deficit disorder." Id. at 2680. However, on cross-examination, Dr. Pasquale testified that the report lacked any evidence that Jackson suffered from a significant mental illness. Id. at 2681.

Ms. Smith,[21] the custodian of medical records for the Newport News Health Department, read into the record a notation from Jackson's social services record: "Counseled on child's bruises. Advised no belt," and a notation that Jackson had previously suffered a fractured arm in 1983 from an unidentified cause. Id. at 2685-86.

Sarah Sutton, a psychologist, testified that she evaluated Jackson in 1996 in response to behavioral problems at home and school. Id. at 2693. She recounted the findings in her written report: Jackson was experiencing "delinquent aggressive behaviors" and "attention problems," expressed feelings of inadequacy and "a lot of anger and resentment around his stepfather," and "tended to act out negative feelings . . . by behaving aggressively and defiantly towards others." Id. at

_____

[21] The record does not include Ms. Smith's first name.

2698-89.  On cross examination, Dr. Sutton reported that she did
not think Jackson was suffering from attention deficit disorder
and reported her conclusion that Jackson's misconduct was
animated by a desire to gain recognition and attention.  Id. at
2703-04.

Maria Mercade, a pediatrician, testified from her report
that in 1994, Jackson suffered a fracture in his ankle and
forearm.  A 1996 medical examination of Jackson documented that,
while in the eighth grade, he started taking Ritalin due to
attention problems at school, but that behavioral problems
including spitting, smearing feces on the walls, and fighting in
school continued.  Id. at 2711-12.  Dr. Mercade also testified
that Jackson admitted to experimentation with cigarettes,
marijuana, and sexual activity.  Id. at 2716-17.

Teri Ancellotti, the record custodian for the New Horizon
Family Counseling Center, read portions of the Center's records
reporting that Jackson began counseling when he was 13, to
address behavioral problems and underachievement at school and
home, including stealing, fighting, property destruction, and
smearing his feces.  Id. at 2723-24.  She read the record of
Jackson's stepfather, Tim Knight, being jailed for physical abuse
after he attempted to punish Jackson for "incredibly defiant
behavior," and a report that Knight had been verbally abusive to
Jackson at counseling sessions, stating at one point that he

wanted Jackson to move out of the house.  Id. at 2726.  She also read records noting that Jackson's mother and stepfather "seem to be confused about how to handle Jerry, since the Court has mandated that Tim cannot use physical punishment," and that Jackson was diagnosed with attention deficit and hyperactivity disorder, major depression, and conduct disorder in 1993, which problems were "compounded by the weakness of the parental subsystem."  Id. at 2727, 2729.  Lastly, she read into the record the report that the family made little progress in counseling, Jackson's behavioral problems continued, and the Center's contact with the family ended in July 1995.  Id. at 2730-31.

James Caffrey, a psychologist, testified that in a March 1997 examination, Jackson was not suffering from hyperactivity, but that he was impulsive, easily angered, guarded, and mistrustful.[22]  Id. at 2737-39.  Jackson reported that he had a difficult relationship with his stepfather.  Id. at 2743. Caffrey concluded that Jackson experienced feelings of loss and abandonment with respect to his nuclear family and harbored fantasies that the family would reunite, and that his anger was due to his perceptions of the family.  Id. at 2744-45.

Mike Spearman, an officer with the James City County Police Department, who had no independent memory of the events,

---

[22] Caffrey was unable to identify Jackson at the trial. J.A. 2739-40.

testified from his notes as to his investigation of Tim Knight for assaulting Jackson in 1993, reading that Jackson suffered bruising and that there was a past allegation of a sexual assault.  Id. at 2769.  No other details were provided.  On cross, Officer Spearman reported that Knight explained his conduct as disciplinary, a reaction to Jackson's stealing.  Id. at 2770-71.

Joyce Morris, custodian of records for the James City County Social Services Department, read from records that when Jackson was 19 months old, he was treated at a hospital for a broken arm, but no cause of the injury was noted; that in 1988, Jackson and his brother Damien were found huddled in a stairwell, locked out of their apartment building by their biological father; that on September 7, 1990, a doctor reported that Jackson had been brought to the emergency room with a "banged-up lip and bruise on his thigh."  Id. at 2776-79.  She also read that Jackson said his stepfather, Tim Knight, had slapped him in the face and later hit him in the eye and chest with a large stick, and that Knight admitted some of these facts to investigators, but said they were in response to Jackson putting a hole in the wall with a toy. Id. at 2780-82.

Other reports read by Morris describe a later incident in May or June 1991 in which Knight struck Jackson with a belt, leaving a horseshoe-type mark, and that Knight made Jackson and

his brother undress before the beatings.  Jackson's mother was present in the house when the incident occurred.  <u>Id</u>. at 2783-85. Although no new charges were brought against Knight, the family was referred to counseling.  <u>Id</u>. at 2785-86.  Morris also read a record from April 27, 1993, documenting that Jackson came to school with strap marks on his body and that Knight had again made both Jackson and Damien remove their clothing, but this time told them to  perform push-ups, sit-ups, and knee bends before he beat them.  <u>Id</u>. at 2791.  The record reflects that Knight explained that he made the boys do the exercises to embarrass them and to punish them for stealing.  <u>Id</u>. at 2799.  As a result of this incident Knight was prosecuted, received a suspended sentence, the family was ordered into counseling, and a protective order was issued preventing physical discipline.  <u>Id</u>. at 2802.  On cross examination, Morris reported Knight's explanation that his actions were "a form of discipline."  <u>Id</u>. at 2804.  As reported by Morris, the records also indicated that Amelia Knight told investigators that Jackson and Damien had been sexually assaulted four years earlier, but no further details were provided and the name of the assaulter was unknown.  <u>Id</u>. at 2799-2800.

Among the seven defense witnesses who knew Jackson was Muriel Custalow, Jackson's godmother, who described a neighbor's report  that Jackson and his brother were often left alone during

the day, sometimes tied in chairs.  Id. at 2757.  Custalow stated that Jackson's biological father, Levi Hamilton, had a reputation for alcohol consumption.  Id.  She also described how she discovered Jackson's broken arm when he was two years old and later observed bruises on his body, but admitted she did not have personal knowledge as to the origins of those injuries.  Id. at 2757-58, 2763.

Tiffany Williams, Jackson's cousin, testified that she observed bruises on Jackson's body on two occasions when he was a child.  Id. at 2765-66.  She did not testify as to any other details about Jackson's life.  Steven Jackson, Jackson's uncle, testified that he had never witnessed any problems between Jackson, his mother, or his biological father, and was unaware of major problems at school.  Id. at 2809-11.

Pastor Mike Privett testified that the Jackson family attended his church between 1991 and 1993, but he lost contact with them thereafter.  Id. at 2813, 2815.  Privett said he counseled the family to improve the parent-child relationship, and described the problems with the Jackson family as "not that far from what a lot of families go through."  Id. at 2815.

Jackson's biological father, Jerry Levi Hamilton, testified briefly, saying that Jackson was "all right" as a child, and that he had no problems with him.  Id. at 2819.  Counsel did not ask any detailed questions, and failed to probe the topic of abuse.

During cross-examination, the prosecution utilized Hamilton to introduce the fact that Jackson's brother Damien was on duty with the United States Navy. Id. at 2822.

Defense counsel also called Tim Knight, Jackson's stepfather, who testified that Jackson began to misbehave at age 10, and recounted specific acts of disobedience. Id. at 2825-27. Knight admitted that he "got in trouble" with social services for disciplining Jackson, but denied hitting him with a board. Id. at 2827-28. He then expressed his exasperation with his other attempts to discipline Jackson, blaming the Commonwealth and the court system for not helping out more. Id. at 2830-31. Counsel failed to ask Knight about the frequency and extent of his disciplinary measures.

Finally, Jackson's mother, Amelia Knight, testified that Jackson had "little behavior problems" growing up, and that Jackson's biological father "didn't show [him] a lot of attention." Id. at 2838-39. When asked about Jackson's poor relationship with his stepfather, she blamed his biological father: "[H]is father was still in the picture telling him, making him problems, you know, that he will come and stay with him, and he was being like rebellious towards us." Id. at 2839. Amelia also recounted Jackson's destructive behavior in school, her unsuccessful attempts to discipline him, and at one point stated that Jackson's brother Damien "had the same problems, but

he corrected himself." Id. at 2840-41. She briefly testified
that she knew of one time when Jackson's stepfather whipped him,
which resulted in bruises and court action. Id. at 2842.
Counsel did not ask her for any details about either Hamilton's
or Knight's abusive conduct towards her or her sons.

Jackson himself testified briefly, apologizing for his
actions, telling his family members that he loved them, and
stating that he did not wish to make any excuses for his conduct.
Id. at 2848-2853.

### 3. Evidence Presented at the Evidentiary Hearing

The jury heard almost no testimony about Jackson's abuse at
the hands of Hamilton, his biological father, however at the
evidentiary hearing Damien provided a wealth of information about
Hamilton, describing how he remembered daily beatings with a belt
or fist, "for as far as I can remember" and for "just about
anything." Tr. 106-07. Before heading out to school, he and
Jackson would cover up the bruises out of fear. Id. at 109. At
other times, the brothers were confined to their room or to the
stairs for hours, where they could not talk or go to the
bathroom. Id. at 104. Damien vividly recalled attempts to hide
from Hamilton. See id. at 107 ("We would hide upstairs in our
room behind the bed or in the closet . . . he'd move the bed and
he'd move stuff out of the closet to get to us if we were running
from him."). Years after the abuse stopped, Damien completely

broke down on the stand when describing how he and Jackson witnessed their father abuse their mother. See id. at 111 ("He would really, like – he would really, like, hurt my mom, and he would sometimes choke her in front of me and my brother, and sometimes we would be crying and crying and crying for him to let her up, get off of her, and he wouldn't . . . .").

Chandal, who stayed with the family over the weekends while Amelia was married to Hamilton, firmly corroborated Damien's testimony that Hamilton beat Jackson "more than twice a day," that he confined both brothers on the steps for hours at a time, and that he beat their mother in front of them, concluding at one point, "The only thing he knew how to do was abuse my brothers," and at another, "when I think of him, just think of him, all I see is him beating my brothers." Id. at 14, 16, 17, 22.[23]  She also testified that Hamilton started giving beer to Jackson when he was "five or six." Id. at 22. She further testified about Jackson's devastation, as a teenager, when Hamilton denied paternity at a custody hearing. Id. at 24-25 ("You could see the tears coming down his face because his dad didn't want anything

---

[23]The dangerousness of the household when Hamilton lived with Amelia was underscored by Chandal's testimony that Amelia sent her to live with her maternal grandmother to escape that household.  Welling with emotion, Chandal described how she had resented the exile, but eventually learned that her two grandmothers had made a pact to keep her away from Hamilton's abuse.  Tr. 13, 87.  The jury was deprived not only of Chandal's words, but of her demeanor while she testified.  The testimony was riveting.

to do with him."). Both Damien and Chandal testified that Jackson remained attached to Hamilton despite the abuse and rejection.

> Well, he always, regardless of the beatings that he was given from his father, he always idolized him. He's his namesake, and he looks a lot like him, so he always wanted a relationship with his dad. Unfortunately, the only relationship he ever had was the abusive one.

Id. at 23 (testimony of Chandal). See also id. at 115 (testimony of Damien).

This compelling testimony was critical to a meaningful mitigation presentation, as it implicates Jackson's early childhood development. Very little information about this period was ever presented to the jury.[24] For the one documented early childhood injury, Jackson's broken arm at age two, the jury had no evidence that Hamilton was the cause, and the Commonwealth highlighted that omission. See J.A. 2688. The nature of Jackson's relationship with his biological father, and its effect on his personality, was never presented.

Damien and Chandal's testimony was also essential to the jury's accurate appreciation of the full picture of abuse by Jackson's stepfather, Tim Knight. Although excerpts of reports

---

[24]One record read to the jury identified Hamilton as having locked Jackson and Damien out of the house. J.A. 2777. Otherwise, almost all of the testimony concerned events that occurred after 1990, by which time Hamilton and Jackson no longer lived in the same household, and Tim Knight had taken over as the abuser.

documenting Knight's abusive conduct were read to the jury, that evidence was superficial and bloodless.  Moreover, that method of presenting evidence enabled the prosecutor to ask each witness to repeat Knight's statements to the investigators that his conduct was a disciplinary response to Jackson's misbehavior.  <u>Id</u>. at 2718-19, 2770-71.  The prosecution was then able, during closing argument, to recast Knight's behavior as relatively benign: "[Y]ou heard the discipline his stepfather tried to impose on him.  Some might say it was excessive discipline, but I would submit to you what he was trying to do on each occasion was to correct a behavior."  <u>Id</u>. at 2864.  Because the vast majority of the defense witnesses were either mere record custodians or the very persons involved in the abuse, these witnesses failed to report how often the abuse occurred, or what prompted it, thereby enabling the prosecution to portray it as a few isolated incidents of discipline prompted by Jackson's own conduct.

     In stark contrast, the vivid descriptions given by Damien and Chandal, who witnessed and experienced Knight's abuse first-hand, would have painted a graphic picture of an unwarranted, continuous, sadistic course of conduct that terrorized and dehumanized Jackson throughout his childhood and left real scars on both of his siblings.  Chandal, for instance, after describing an incident in which Knight attempted to sexually molest her, stated, "Oh, I really didn't trust him then.  I often slept with

a knife under my pillow for protection." Tr. 29. The following excerpts are representative of Chandal's and Damien's testimony about Knight's abuse:

> [W]hen we came back, my brother was sitting in the middle of the floor with no clothes on, and he had welts about maybe that big (indicating), and he had a two-by-four sitting next to him on the floor where he had been beaten. He was bleeding from the two-by-four marks that was left on his body from my stepfather beating him. . . . when we got to the house, they [Amelia and Knight] immediately started arguing . . . and before I knew it my mom was on her bedroom floor with him on top of her throttling her. He was choking her. I went to intervene, and I grabbed a cane, and I went to hit him with a cane, and the rest is just kind of a blur. All I know is we ended up in a car in which I tried to run him down with the car . . . . I ended up going to stay with my grandmother, and my mom and my brothers went to a shelter for battered women.

Id. at 30 (testimony of Chandal).

> [The beatings occurred] maybe twice a week . . . . He would make them strip down. Whenever they got a beating, they had to strip all the way down, take their clothes completely off, including their underclothes. He would make them do jumping jacks. . . . I personally witnessed them doing jumping jacks with no clothes on.

Id. at 36 (testimony of Chandal).

> [T]he one that stands out the most is the fact that he struck my brother over 70 times with the belt. I heard him every time. I counted.

Id. at 37 (testimony of Chandal).

> Told me and my brother to strip our clothes off, and he just started beating me. I don't know why me first, but he beat me, and then a lot of crying, really, really hurting, and then he started beating my brother, and he just kept beating him and beating him and beating him and beating him, and I don't know why he didn't stop, and my brother was just standing there, and he wouldn't even, he wouldn't even stop. . . . And, well, I remember my mom,

she – I remember her coming upstairs, but she didn't even stop him.  I don't know how many times she came up the stairs.  I remember her coming up, and she didn't even stop Tim from beating us at all.

Id. at 123 (testimony of Damien).

[Jerry] didn't break down . . . he was standing there whenever we'd get beat or something, he wouldn't like, give in as easily as I would, and he would actually say, "You shouldn't be doing this.  You're not my dad.  I don't like you.  You should not be here."  And he kept saying all of that, and then Tim would keep hitting him more.

And this was, like, whenever, pretty much whenever we got beat. He was like that.  It was a battle between both of them, and then [Jerry] would eventually just get quiet and give in and just fall to the ground or whatever crying.

Id. at 127 (testimony of Damien).

I just remember my stepfather telling me and my brother to pull down our pants and stand up and play with ourselves, and I don't even know what happened.  All I remember is that we each put our clothes back on and we went to bed, and that was it. . . . He stood there watching us while we were masturbating.

Id. at 145 (testimony of Damien).

Damien's testimony would have given the jury significant evidence upon which to reject the prosecutor's repeated suggestion that Damien had fully escaped his past and would have shed light on the differences between him and Jackson that helped explain why their lives took different paths: "I'm much more of an introvert; he's much more of an extrovert; and so like—I don't like confrontation at all.  I don't like any kind of confrontation.  I don't like talking.  I don't like dealing with

any kind of confrontation." Id. at 137.

Finally, Damien, Chandal, and the others who testified at the evidentiary hearing could have provided evidence of Jackson's positive qualities, evidence that was indisputably absent from the trial, by giving vivid, concrete examples of his strong relationships with them, of how he tried to protect his mother from abuse, and the love he displayed for his grandmother. In sum, these witnesses would have unlocked the door to Jackson's true childhood experiences, and changed the entire landscape of the jury's sentencing deliberation by humanizing him.

### 4. Analysis

Counsel's goal, in the penalty phase of a capital case, should be "to help the jury see the client as someone they do not want to kill." ABA Guidelines (1989 ed.), 11.8.6, cmt. Protogyrou's mitigation presentation effectively reduced Jerry Terrell Jackson to a faceless character in record books, a "bad egg" who brought corporal punishment on himself. By putting a human face on Jackson, and expressing their love for him, Damien and Chandal would have helped create a more accurate picture of a young, badly damaged human being whose life should be spared.

In support of its argument that counsel's actions did not prejudice Jackson, the Commonwealth attacks the reliability and weight of Damien and Chandal's testimony, arguing that their accounts were "inherently distorted" by the nature of the habeas

proceeding; that it was "rehearsed;" that they would not have been mature witnesses in 2002; and that they were not familiar with Jackson's entire juvenile record. Warden's Post-Hearing Closing Argument at 10. None of these arguments has merit.

Credibility determinations must be made by the factfinder. The Court presided over the evidentiary hearing and carefully observed the witnesses' demeanor and tone, particularly during vigorous cross-examination. Damien and Chandal would have been extremely powerful and persuasive witnesses during the penalty phase; their testimony and their reactions on the stand came across as completely genuine.[25]

The Commonwealth also argues that neither Damien nor Chandal "would have made a mature witness in 2002" because of the "difficulties that they faced at the time of trial." Id. However, to the extent that Damien and Chandal were suffering from particular physical or psychological difficulties in 2002, those difficulties could have been prominently displayed to the jury and connected to the same abuse that Jackson suffered.

Additionally, during the evidentiary hearing, the Commonwealth attempted to undermine the credibility of Damien and

---

[25] Damien and Chandal were hardly polished witnesses. Both of them cried during their testimony, Tr. 54, 111, and Chandal admitted to being nervous, id. at 7. Moreover, one can at least equally impugn the testimony of Kelley and Protogyrou, who admitted meeting with each other to discuss their testimony as well as with attorneys for the Commonwealth in advance of the evidentiary hearing. See id. at 333-35.

Chandal because they were not aware of Jackson's entire criminal record.  This strategy was entirely unpersuasive.  Both siblings unquestionably had close relationships with Jackson and were aware, to a great degree, of his misconduct.

Lastly, the Commonwealth has not identified any obstacle that would have prevented either sibling's presence at trial.  To the contrary, Chandal testified that she attended every portion of the trial, but stayed outside the courtroom because she thought she might be called as a witness.  See Tr. 58.  A handwritten note by Jackson, apparently written during the trial, confirms her availability to testify.  See Pet. Exhibit 65 ("My sister is here.").  Damien similarly testified that he would have attended the trial and served as a witness if asked.  Tr. 147.

The Virginia Supreme Court held that Jackson could not show prejudice from counsel's failure to investigate because counsel would not have called Damien even had he interviewed him:

> The affidavit of trial counsel demonstrates that counsel
> made a strategic decision not to call petitioner's
> brother, Damien Jackson, to testify because Damien's
> successful transition from the abusive environment into
> a military career would have diminished the mitigating
> effect of petitioner's abusive upbringing. Counsel were
> aware of the child abuse suffered by the petitioner when
> counsel decided not to call Damien as a witness. Nothing
> in the record demonstrates that counsel's decision would
> have been altered by knowing the specific details of the
> abuse that petitioner's siblings now provide.

Jackson II, 627 S.E.2d at 786-87.  The Jackson II opinion does not specifically reference Chandal at all.   The Virginia Supreme

Court reached this conclusion without the benefit of an evidentiary hearing, and erroneously gave deference to trial counsel's premature, uninformed "strategic" choice. The conclusion that "nothing in the record demonstrates that counsel's decision would have been altered" relies on an erroneous, subjective standard rather than an objective one. The question is not whether, subjectively, Jackson's own counsel would have introduced the evidence. The question is whether, objectively, "a competent attorney, aware of this evidence, would have introduced it." Wiggins, 539 U.S. at 535. If the standard articulated by the Virginia Supreme Court were correct, a petitioner could virtually never succeed on a claim of prejudice based on even the most egregious failure to investigate evidence, because the respondent could simply argue that the petitioner's own incompetent trial counsel would not have introduced the new evidence anyway. The Virginia Supreme Court's analysis of Jackson's first claim of prejudice was therefore contrary to, and an unreasonable application of, Wiggins, a case that court failed to cite in its opinion. A competent attorney, after interviewing the siblings, would have understood that their testimony would have strengthened, not undermined, Jackson's case.

As to Jackson's second prejudice claim, the Virginia Supreme Court concluded that the new evidence of abuse proffered by Jackson was cumulative, id. at 787, referring to "ample evidence,

including the testimony of physicians, psychologists, social
workers, and a pastor . . . substantiat[ing] that petitioner was
the victim of child abuse." Id. at 786.[26]  This characterization
of the evidence is simply not supported by the record.  In fact,
the psychologists' testimony was limited to Jackson's attention
deficit disorder and depression, and none of their records
indicate that they were even aware of Jackson's physical abuse.
Additionally, much of the other testimony referenced by the
Virginia Supreme Court in fact served only to undercut the
mitigating value of the abuse.  One of the physicians, for
instance, testified that Jackson's treatment "was consistent with
discipline," and the pastor described it as "not that far from
what a lot of families go through."

Although trial counsel presented some evidence of Jackson's
childhood abuse to the jury, supra, the Virginia Supreme Court's
superficial and mechanical prejudice analysis was an unreasonable
application of the law to the facts of Jackson's case.  See
Williams, 529 U.S. at 413.  In the penalty phase of a capital
case, the prejudice inquiry is not a rote cataloging exercise

---

[26] Similarly, the court found that because "the jury heard
evidence of petitioner's good qualities" during the proceeding,
and because Jackson did not "demonstrate how additional evidence
of his good character, such as his love for his grandmother and
his desire that his parents reunite, would have affected the
jury's determination," there was no indication that additional
evidence would have altered the jury's verdict.  Id. at 787.  As
explained supra, the Virginia Supreme Court erroneously found
that the jury heard evidence of Jackson's good qualities.

where a court merely ensures that counsel presented some testimony on each potential area of mitigation.  Rather, a court must examine the "entire evidentiary picture" presented to the jury, Strickland, 466 U.S. at 696, and ask whether that picture would have changed if counsel had conducted a proper mitigation investigation and presentation.  See Wiggins, 539 U.S. at 538 (asking whether "the available mitigating evidence, taken as a whole, might well have influenced the jury's appraisal of [petitioner's] moral culpability" (internal quotation and citation omitted)); see also Cone v. Bell, 129 S.Ct. 1769, 1786 (2009) (noting that prejudice can occur if the evidence, "viewed cumulatively," may have led to a different decision).

The picture painted of Jackson by his own counsel all but invited a death verdict.  The jury heard a parade of ineffective record witnesses testify to isolated incidents of abuse,[27] followed by contradictory testimony from character witnesses who reported little or no abuse.  Jackson's abusers took the stand and offered unchallenged testimony that Jackson's problems were his own fault.  As Dr. Matthew Mendel, a clinical psychologist

---

[27] As discussed previously, the ineffectiveness of that presentation drew the contemporaneous observation from the trial judge,"I have got to tell you that some of the testimony, and you will agree, is a little tedious, a little slow, and it's not, I won't say boring, but it's difficult and it's low key. . . . it would be relatively easy for someone to doze off. . . . I am paying as close attention as I can and sometimes I get a little tired."  J.A. 2789.

who offered an affidavit in support of Jackson's habeas petition, explained,

> The contrast between the terror in which [Jackson] was raised and the way in which his upbringing was presented to the jury could not have been more stark. The jury saw a family in which physical discipline occasionally got out of hand in reaction to their chronically misbehaving youngster. The reality was of a boy living in terror – constantly physically and emotionally abused from a very young age.

Pet. Ex. EE ¶ 18.[28]

In light of counsel's deficient performance, it is no surprise that the jury's decision was to impose the death penalty. The prejudice arising from this failure is aptly described in Judge Kozinski's eloquent prose:

> The harm caused by counsel's failure to investigate and present evidence of abuse was not just that the jury was deprived of relevant information about [petitioner's] childhood. [Trial] counsel called both [petitioner's] [father] and stepfather – the alleged abusers – to testify during sentencing. We cannot fault this decision, as a defendant's parents will often make the most persuasive case to the jury for sparing their son's life. But the evidence he elicited from the parents suggested – in stark contrast to what counsel's own investigation had revealed – that [petitioner] had a normal, non-violent childhood.
>
> . . .
>
> The jury, left to wonder how [petitioner] learned to

---

[28] By way of example, although the jury did hear a record custodian read a reference to Jackson being beaten with a two-by-four, they also heard Knight deny that event, and no other witness discussed it. Chandal's horrific account of the same incident, quoted <u>supra</u>, can in no sense be considered cumulative of the trial record but is undoubtedly different in "kind" as contemplated by <u>Wiggins</u>.

commit such violent acts, could not look to his childhood
as an explanation – his parents' testimony and counsel's
deficiency took care of that – but must instead have
concluded that he grew violent despite his childhood.

Boyde v. Brown, 404 F.3d 1159, 1177-78 (9th Cir. 2005) (footnote
omitted).

Moreover, Damien's testimony that Jackson was not the only
one who left the household with devastating emotional and
behavioral problems, could have lead at least one juror to have
voted to spare Jackson's life.  Instead, as a result of counsel's
reliance on record custodians and unreliable witnesses, his
failure to conduct adequate investigation, and his presentation
of unchallenged denials by Jackson's abusers, the jury returned a
verdict for death after being presented with a very brief case by
the Commonwealth consisting of details of the horrific crime and
Jackson's criminal history, which was essentially non-violent.

Prejudice in this case was compounded, as alleged in Claim
II, by counsel's failure to provide a link between Jackson's
childhood abuse and psychological and developmental consequences
in adulthood.  Such evidence would have provided an alternative
conclusion than that Jackson was merely a "bad egg."  Jackson has
provided the Court with numerous articles showing the consensus
among mental health professions linking childhood abuse to adult
behavior.  Such information was publicly available at the time of
Jackson's trial and could have been introduced through the
psychologists already retained as defense experts.  Although the

Commonwealth would have been free to present their own scientific evidence, this mitigating evidence would have provided a significant link between Jackson's abusive childhood and the key mitigative sentencing inquiry: assessment of his moral culpability as an adult.

For all these reasons, the Court finds that Jackson has met his burden as to Claims I and II under both prongs of Strickland, and that based on counsel's failure to investigate and present evidence of childhood abuse their representation was constitutionally ineffective.  Given this conclusion, it is unnecessary to determine whether Claim III—counsel's failure to introduce good character evidence—independently meets Strickland's prejudice prong.  However, the Court finds that at least in combination with Claim I, Claim III meets the prejudice prong of Strickland.  Accordingly, relief will be granted as to Claims I, II, and III.

III. Failure to Give Proper Mitigation Instructions

Jackson argues that the trial court's mitigation instructions were erroneous in two critical respects.  First, when the trial judge instructed the jury that "Any decision you make regarding punishment must be unanimous," he failed to include the clarification that mitigating factors need not be found unanimously.  J.A. 881.  Second, the trial judge failed to instruct the jury as to the specific mitigating factors of the

defendant's age and troubled background—factors which two jurors explicitly stated in <u>voir</u> <u>dire</u> they would <u>not</u> consider mitigating unless instructed to do so by the court.  Jackson raises each of these claims independently, and under the umbrella of ineffective assistance of counsel, as trial counsel failed to object to the defective instructions at trial and did not raise the issue on appeal.

A.   Claims IV and V: Failure to Instruct on Mitigating Factors of Age and Troubled Background

The United States Supreme Court has held on multiple occasions that a defendant's age and troubled background are two primary forms of mitigating evidence in a capital case.  <u>See</u>, <u>e.g.</u>, <u>Penry v. Lynaugh</u>, 492 U.S. 302 (1989) (death sentence unconstitutional where jurors were prevented from giving effect to evidence of child abuse); <u>Eddings v. Oklahoma</u>, 455 U.S. 104, 115 (1982) ("Nor do we doubt that the evidence Eddings offered was relevant mitigating evidence," including "youth" and a "difficult family history").  Age in particular is such an important mitigating factor that the Supreme Court has created a constitutional bar to sentencing minor defendants to death. <u>Roper v. Simmons</u>, 543 U.S. 551 (2005).

Trial counsel and the trial court knew from the <u>voir</u> <u>dire</u> that two jurors felt that neither age nor troubled background were mitigating factors.  During <u>voir</u> <u>dire</u>, juror Berube was asked, "Would you be able to consider Mr. Jackson's age when

-59-

making the decision on whether to impose a life sentence or a death sentence?" to which she responded, "No." J.A. 1524. After hearing a list of general mitigating factors, including "the history and background of the defendant . . . background in growing up," Berube was asked, "How about the other factors?" to which she answered, "No." Id. at 1525. Juror Berube was then asked, "If the Court instructs you age matters, would you then consider it?" to which she responded, "Yes," and the follow-up question, "Will you follow the Court's instructions?" to which she again replied, "Yes, of course." Id. at 1526. Similarly, juror Metheny, when asked, "Would you be able to consider the age of Mr. Jackson in making a decision on whether to impose life without the possibility of parole, or death?" responded, "No." Id. at 1438. She was then asked, "His age would have no effect?" to which she again responded, "No." Id. Like Berube, Metheny was also read a short list of other mitigating factors, including, "family, doctors, past, the way he grew up, would you consider those issues in mitigation before that – in considering life without parole or the death penalty?" to which she responded, "No." When juror Metheny was further asked, "Those issues don't matter to you, even if you were instructed to consider them, they don't matter to you?" she replied, "If I was instructed, yes, I understand what you're saying. Yes, if I was instructed to do so, I would." Id. at 1439.

Although in ruling on alleged error during the guilt phase this Court denied Jackson's claim that the seating of these two jurors violated <u>Morgan v. Illinois</u>, 504 U.S. 719 (1992), that ruling does not foreclose considering Jackson's claim about the inadequacy of the jury instruction.  To the contrary, that ruling underscores the ineffectiveness of counsel and the error in the trial court's mitigation instructions.  Although each juror's promise that they would consider these mitigating factors if so instructed was enough to satisfy the requirements of  <u>Morgan</u>, the failure of the trial court to then instruct the jury as to these mitigating factors treads on the guarantees of the Eighth Amendment.  <u>See</u> <u>Eddings</u>, 455 U.S. at 114-15 ("The sentencer . . . may determine the weight to be given relevant mitigating evidence.  But they may not give it no weight by excluding such evidence from their consideration."); <u>see also</u> <u>Smith v. Texas</u>, 543 U.S. 37, 46 (2004) (jurors must "be able to 'consider and give effect to [a defendant's mitigation] evidence in imposing sentence'") (<u>quoting</u> <u>Penry v. Johnson</u>, 532 U.S. 782, 797 (2001) (brackets in original)).

Despite being aware that these two jurors had stated they would not consider Jackson's age or troubled background as mitigating factors without a specific instruction, the trial judge only instructed the jury that: "in determining the appropriate punishment you shall consider any mitigation evidence

presented of circumstances which do not justify or excuse the offense but which in fairness or mercy may extenuate or reduce the degree of moral culpability and punishment." J.A. 2613, 2854-55. The court notably failed to include Virginia's statutory language on mitigation, which lists "the age of the defendant at the time of the commission of the capital offense" as one example of mitigation. Va. Code § 19.2-264.4(B)(v).[29]

Given these two jurors' responses and Jackson's youth (he was 20 years old at the time of the offense) and counsel's strategic decision to offer the abusive background as a mitigating factor, failure to instruct the jury to consider the mitigating factors of age and troubled background was a defect of constitutional proportion, even though a failure to instruct a jury as to specific mitigating factors is generally not constitutional error. See Buchanan v. Angelone, 522 U.S. 269, 278 (1998) ("The absence of an instruction . . . on particular statutorily defined mitigating factors did not violate the Eighth

_____

[29] The full text of this statute reads: "Facts in mitigation may include, but shall not be limited to, the following: (i) the defendant has no significant history of prior criminal activity, (ii) the capital felony was committed while the defendant was under the influence of extreme mental or emotional disturbance, (iii) the victim was a participant in the defendant's conduct or consented to the act, (iv) at the time of the commission of the capital felony, the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was significantly impaired, (v) the age of the defendant at the time of the commission of the capital offense, or (vi) . . . the subaverage intellectual functioning of the defendant." Va. Code § 19.2-264.4(B).

[Amendment.]").  Evident from the Buchanan opinion, which arose from a Virginia case, is the relevance of the "entire context in which the instructions were given," which in Buchanan amounted to a finding that it was "not likely that the jury would disregard this extensive testimony [two days of testimony relating to petitioner's family background and mental and emotional problems] in making its decision, particularly given the instruction to consider 'all the evidence.'" Id. at 278.  Here, unlike in Buchanan, the "entire context" clearly reveals that at least two jurors had stated, under penalty of perjury, that they would not consider one of Virginia's statutory mitigating factors, age, and one of the defense's themes, the constitutionally protected mitigating factor of troubled childhood,[30] unless specifically instructed to do so by the trial court.

This claim was procedurally defaulted in Jackson's state habeas proceedings, because his counsel failed to raise it at trial or on direct appeal.  As Jackson correctly argues, this Court is not bound by the state bar, because counsel's failure amounts to "cause for the default."  Coleman, 501 U.S. at 750. Because Jackson also brings the same claim under the umbrella of

---

[30] See, e.g., California v. Brown, 479 U.S. 538, 548 (1987) ("The fact that his parents divorced when he was five, that his mother was an alcoholic and possibly a prostitute, and that his father used excessive physical punishment were all deemed relevant to the sentencing decision because of their potential for evoking sympathy for petitioner." (citing Eddings, 455 U.S. at 107); Eddings, 455 U.S. at 115, supra.

ineffective assistance of counsel, this claim can be addressed by a single analysis.

Trial counsel's failure to ask for a proper instruction meets the deficiency prong of <u>Strickland</u> because, as trial counsel has admitted, his failure to request such an instruction was not a strategic decision. State Habeas Pet. Ex. H ¶ 11 ("I forgot what these two jurors had said, and I did not propose an instruction[.]"). Moreover, counsel was unquestionably aware of at least juror Berube's need for such an instruction, as he moved to strike her for cause on the basis of her statement during <u>voir dire</u> that she would not consider age or background as mitigating factors.

The United States Supreme Court's "cases have established that the sentencer may not be precluded from considering, and may not refuse to consider, any constitutionally relevant mitigating evidence." <u>Buchanan</u>, 522 U.S. at 276 (<u>citing</u> <u>Penry v. Lynaugh</u>, 492 U.S. at 317-18; <u>Eddings</u>, 455 U.S. at 113-14; <u>Lockett v. Ohio</u>, 438 U.S. 586, 604 (1978)). <u>See</u> <u>also</u> <u>Mills v. Maryland</u>, 486 U.S. 367, 374-75 (1988) (the "sentencer may not refuse to consider or be precluded from considering any relevant mitigating evidence"). In light of the clear constitutional mandate that the jury consider age and troubled background in evaluating whether a capital sentence is justified, <u>see</u> <u>supra</u> at pp. 58-59 and 63, n.31, and the specific <u>voir dire</u> in this case, there is a strong

likelihood that such an instruction would have been given by the trial court had counsel only asked for it.  The prejudice from this failure to instruct properly on what may be considered a mitigating factor is compounded by the second assignment of instructional error, that Jackson's jurors were not instructed that they could consider a factor as having a mitigating effect without a unanimous finding of that factor, discussed <u>infra</u>. Viewed in this light, the instructions permitted Berube and Metheny to preclude other jurors from considering either the defendant's age or troubled background in their sentencing deliberations.

The Virginia Supreme Court found that this claim satisfied neither prong of <u>Strickland</u>.  However, that conclusion was based on the speculative assumption that the trial court would have refused to give such an instruction.[31]  The "record discloses no basis" for that conclusion, disentitling it to AEDPA deference in that respect.  <u>Uttecht v. Brown</u>, 551 U.S. 1, 20 (2007).  As the record shows, the trial judge seated juror Berube specifically because she agreed to consider age as a mitigating factor if so instructed.  J.A. 1530-31 ("[These jurors] don't know whether that's a factor for them to consider or not.  It might be a

---

[31] The state court's holding, relying only on Virginia cases, rests on the conclusion that counsel was not deficient because "an instruction emphasizing individual mitigating factors would have been properly refused."  <u>Jackson II</u>, 627 S.E.2d at 788.

factor they are not going to consider but when they're told it's
a factor they must consider or they should consider, not what
weight they'd give to it, they all agree that they'll consider
it.  I will consider it in that light and I'll seat the juror.").
This statement by the trial judge certainly indicates his
appreciation of the need for a clarifying instruction.

The Virginia Supreme Court also held that, "the record
demonstrates that the jury was instructed to consider
petitioner's history, background, and mitigating factors in
determining whether petitioner posed a future danger to society."
Jackson II, 627 S.E.2d at 788.  That conclusion is contrary to
the holding of Penry v. Lynaugh, in which the Supreme Court found
that Texas's "future dangerousness" special issue did not provide
an adequate vehicle for the jury to give mitigating effect to
defendant's evidence of child abuse; rather, such evidence could
only be given aggravating effect when considered through the
"future dangerousness" lens, and accordingly the defendant was
entitled to a separate mitigation instruction.  492 U.S. at 323-
24.  This rule has been consistently enforced by the Supreme
Court.  See, e.g., Smith v. Texas, 550 U.S. 297 (2007); Brewer v.
Quarterman, 550 U.S. 286 (2007); Abdul-Kabir v. Quarterman, 550
U.S. 233 (2007); Tennard v. Dretke, 542 U.S. 274 (2004); Smith v.
Texas, 543 U.S. 37 (2004); Penry v. Johnson, 532 U.S. 782 (2001).
The Virginia Supreme Court's conclusion is contrary to this line

of precedent.  Because the Virginia Supreme Court's denial of
this claim was contrary to clearly established federal law,
relief will be granted on Claims IV and V.

> B.    Claims VII and VIII: Failure to Instruct Jurors that
> Mitigating Factors Need Not be Unanimously Found

Jackson also claims that the trial court's instruction that
"[a]ny decision you make regarding punishment must be unanimous,"
creates a reasonable probability that his jurors believed, as a
result, that any finding of mitigation had to be unanimous.  This
claim is raised both independently and as an ineffective
assistance of counsel claim, because counsel failed to request
such a proper mitigation instruction or to raise this issue on
direct appeal.  The Virginia Supreme Court held that the stand-
alone claim was  procedurally defaulted and found the Strickland
claim failed to meet either the deficiency or prejudice prongs.

Resolution of this claim is controlled by Mills, 486 U.S.
367 (1988), and McKoy v. North Carolina, 494 U.S. 433 (1990).  In
Mills, which involved a jury instruction that stressed the need
for unanimity on all issues presented and a verdict form that
required unanimous findings of independent mitigating factors,
the Court expressed concern that jurors

> could be precluded from considering, as a mitigating
> factor, an aspect of a defendant's character or record or
> a circumstance of the offense that the defendant
> proffered as a basis for a sentence less than death, if
> even a single juror adhered to the view that such a
> factor should not be so considered.

Mills, 486 U.S. at 379 (internal quotations, brackets, emphasis and citation omitted). The Court accordingly held,

> We conclude that there is a substantial probability that reasonable jurors, upon receiving the judge's instructions in this case, and in attempting to complete the verdict form as instructed, well may have thought they were precluded from considering any mitigating evidence unless all 12 jurors agreed on the existence of a particular such circumstance. Under our cases, the sentencer must be permitted to consider all mitigating evidence. The possibility that a single juror could block such consideration, and consequently require the jury to impose the death penalty, is one we dare not risk.

Id. at 384.

Any confusion over the holding in Mills was clarified by the Court in McKoy, vacating a North Carolina death sentence in which the instruction read, "the jury is required to make its decision based only on those circumstances it unanimously finds." The flaw in that instruction was that it could allow "one holdout juror to prevent the others from giving effect to evidence that they believe calls for a sentence less than death." 494 U.S. at 439 (internal quotations omitted). As the McKoy Court distilled the Mills holding, "it would be the height of arbitrariness to allow or require the imposition of the death penalty where 1 juror was able to prevent the other 11 from giving effect to mitigating evidence." Id. at 440 (internal quotations omitted).

Jackson's jury was orally instructed that "[a]ny decision you make regarding punishment must be unanimous," and that same

language was affixed to Instruction Number S-1, Pet. Ex.69, at 881, which was the only instruction that covered the entire deliberative process, including not only findings of aggravating factors but also those of mitigating factors.  Accordingly, the instructions did not comply with the law clearly established in Mills and McKoy, and the Virginia Supreme Court's conclusions as to the adequacy of how counsel and the trial court handled the jury instructions reveals a fundamental misunderstanding of clearly established federal law.  In holding that the trial court's unanimity instruction "did not preclude the jury from considering mitigating evidence," and that counsel was "not unreasonable for failing to request an instruction that was not necessary or required," the Virginia Supreme Court ignored the significant constitutional requirement that jurors be permitted not only to consider mitigation, but also to give it meaningful effect in their sentencing decision.  See Franklin v. Lynaugh, 487 U.S. 164, 185 (1988) (opinion of O'Connor, J., concurring in judgment) ("Indeed, the right to have the sentencer consider and weigh relevant mitigating evidence would be meaningless unless the sentencer was also permitted to give effect to its consideration."); see also Abdul-Kabir, 550 U.S. at 252 (quoting the above language from Franklin and noting, "Justice O'Connor's separate opinion in Franklin correctly defined the relevant rule of law").  The Supreme Court's consistent "concern has been that

restrictions of the jury's sentencing determination not preclude
the jury from being able to give effect to mitigating evidence."
Buchanan, 522 U.S. at 276. See id. at 276 ("the state may shape
and structure the jury's consideration of mitigation so long as
it does not preclude the jury from giving effect to any relevant
mitigating evidence") (citing Johnson v. Texas, 509 U.S. 350, 362
(1993); Penry v. Lynaugh, 492 U.S. at 326; Franklin, 487 U.S. at
181). Mills's contribution to this line of cases was to
emphasize that individual jurors, rather than merely the jury as
a whole, must be given a vehicle to give effect to mitigating
evidence. See Beard v. Banks, 542 U.S. 406, 414 (2004) ("Mills'
innovation rests with its shift in focus to individual jurors.").

To comply with Mills, each of the jurors in Jackson's case
had to be free to give effect to each piece of mitigating
evidence in the ultimate sentencing vote, independent of what any
other juror thought of that particular piece of mitigating
evidence. In denying relief on this claim, the Virginia Supreme
Court relied on Roach v. Angelone, 176 F.3d 210, 223 (4th Cir.
1999), a Fourth Circuit case in which a unanimity instruction
identical to that given in Jackson's case was distinguished from
Mills and McKoy on the ground that "the Virginia sentencing
scheme does not require juries to make findings as to specific
mitigating factors[,]" but are instead "instructed to consider
all possible mitigating circumstances before rendering their

sentencing decision." 176 F.3d at 223.  <u>Roach</u>, however, was decided five years before <u>Beard v. Banks</u>, the case that identified <u>Mills</u> as a new rule of constitutional law, separate and distinct from prior caselaw requiring only the sentencing <u>body</u> to consider mitigating evidence. 542 U.S. 406. Under a pre-<u>Banks</u> analysis, the Virginia Supreme Court's conclusion that the "trial court's instruction that the jury's decision regarding punishment must be unanimous did not preclude the jury from considering mitigating evidence," might be supportable. <u>Jackson II</u>, 627 S.E.2d at 788. However, post-<u>Banks</u>, it is undeniably clear that each juror must understand that he or she individually has the authority to consider and give effect to mitigating evidence.[32] Because the Virginia Supreme Court's denial of this claim was contrary to clearly established federal law, relief will be granted on Claims VII and VIII.

IV. Failure to Object to Commonwealth's Nullification Argument

In Claim IX, raised independently, and in Claim X, raised as an ineffective assistance of counsel claim, Jackson alleges that the prosecutor improperly nullified his mitigation in closing argument. Specifically Jackson objects to the argument that his troubled family background was not a reason to spare his life,

---

[32] <u>Mills</u> and <u>McKoy</u> would compel a finding of prejudice even without Berube and Metheny's refusal to consider petitioner's age or background. With the specific responses of Berube and Metheny the prejudice from failing to instruct properly is overwhelmingly established.

because Jackson could have "corrected himself" as his brother Damien was able to do. J.A. 2864. Jackson maintains this argument took the jury's focus away from the constitutionally required individualized capital sentencing decision to which he was entitled, and therefore had a "substantial and injurious effect or influence in determining the jury's verdict." Brecht v. Abrahamson, 507 U.S. 619 (1993) (internal quotations omitted). Jackson further argues that trial counsel was ineffective for failing to object to the prosecutor's argument.

Claim IX is procedurally defaulted for failure to raise it at trial or on direct appeal. As to Claim X, the Virginia Supreme Court held that the Strickland claim failed to meet either the performance or prejudice prong of an ineffective assistance of counsel claim because the prosecutor has a right to argue the evidence and to urge fair inferences arising from it. Jackson II, 627 S.E.2d at 789-90 (citing Martinez v. Commonwealth, 403 S.E.2d 358, 359 (Va. 1991)). Although there are some limits to a prosecutor's closing arguments in a capital sentencing hearing, the prosecutor in Jackson's case stayed well within those limits. The Virginia Supreme Court's ruling on this claim was not contrary to, or an unreasonable application of, Strickland. Therefore, Claims IX and X will be denied.

## Conclusion

For the above stated reasons, the Court will grant the

petition for a writ of habeas corpus as to Claims I, II, III, IV V, VII and VIII, grant the respondent's Motion to Dismiss as to Claims IX and X, vacate petitioner's death sentence, and stay the issuance of the writ of habeas corpus for 60 days to allow the Commonwealth to decide whether to initiate a new sentencing proceeding in a manner consistent with this Memorandum Opinion and so advise the Court.  Should the Commonwealth decide not to initiate a new sentencing proceeding, the writ shall issue and the Commonwealth shall sentence petitioner to life imprisonment.

A separate order consistent with this opinion will be entered.

Entered this 29th day of March, 2010.


                                        _____/s/_____
                                        Leonie M. Brinkema
                                        United States District Judge
Alexandria, Virginia